UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

E & T SKYLINE CONSTRUCTION, LLC,

                          Plaintiff,

            -against-

TALISMAN CASUALTY INSURANCE
COMPANY, LLC,

                          Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   3/2/2022

19 Civ. 8069 (AT)

**ORDER**

ANALISA TORRES, District Judge:

In this action, Plaintiff, E&T Skyline Construction, LLC ("E&T"), seeks to enforce

obligations under a bond issued by Defendant, Talisman Casualty Insurance Company, LLC

("Talisman"), to cover the performance of NY Renaissance Corporation ("NYR"), a non-party

subcontractor retained by E&T in connection with a construction project.  Compl., ECF No. 6.

Before the Court are the parties' cross-motions for summary judgment.  Pl. Mot., ECF No. 95; Def.

Mot., ECF No. 99.  For the reasons stated below, the cross-motions are DENIED.

**BACKGROUND**[1]

I.      Jurisdiction

E&T is a New York limited liability company ("LLC").  Def. 56.1 ¶ 12, ECF No. 102.  Its

two members are residents and citizens of New York and New Jersey respectively.  Id. ¶ 13.

Talisman is a Nevada LLC formed pursuant to Chapter 86 of the Nevada Revised Statutes.  Id. ¶ 14.

On December 16, 2013, Talisman filed Articles of Organization to register as an LLC with the

Nevada Secretary of State.  Id. ¶ 15; Articles of Organization, ECF No. 100-2 at 3.  The Articles of

Organization state that Talisman shall be managed by "managers," rather than "members," and

---

[1] The facts in this section are taken from the parties' 56.1 statements, unless otherwise noted.  Citations to a paragraph in the Rule 56.1 statement also includes the other party's response.  The Court considers admitted for purposes of the motion any paragraph that is not specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.  Local Civ. R. 56.1(c).  Where there are no citations, or where the cited materials do not support the factual assertions in the statements, the Court is free to disregard the assertion.  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001).

identifies three individuals, including Jeffrey Schaff, as Talisman's "managers."  Articles of

Organization at 3, *see also* Def. 56.1 ¶¶ 17, 18.  Schaff executed the Articles of Organization as the

"organizer" of the LLC.  Articles of Organization at 3; Def. 56.1 ¶ 16.  On December 17, 2013, the

Nevada Secretary of State issued Talisman an LLC charter.  *Id.* ¶ 20.  Talisman is, and has been, in

good standing as an LLC with the state of Nevada.  *Id.* ¶ 21.

On January 24, 2014, Talisman adopted an operating agreement (the "Operating Agreement").

*Id.* ¶ 22.  Pursuant to the Operating Agreement, Schaff, a citizen of Louisiana, was identified as

Talisman's sole member.  *Id.* ¶ 23.  The Operating Agreement stipulates that it "govern[s] the

member within the limited liability company."  Operating Agreement at 1, ECF No. 100-5.  Section 6

of the Operating Agreement indicates that Schaff made a $500,000 initial capital contribution to

Defendant.  *Id.* ¶ 6.  Section 22 of the Operating Agreement states that Talisman's management "is

vested in the [m]embers."  *Id.* ¶ 22.  Section 32 of the Operating Agreement delineates procedures for

the voluntary withdrawal of members, which includes a provision that members may not withdraw

within six months of the date of execution of the Operating Agreement; and, that members must

provide written notice of intention to withdraw.  *Id.* ¶ 32.  Section 41 of the Operating Agreement

further states that Talisman "will . . . be dissolved on the occurrence of events specified" in Chapter

86 of the Nevada Revised Statutes.  *Id.* ¶¶ 1, 41.

On January 26, 2014, Talisman adopted an amendment to the Operating Agreement (the

"Amendment"), signed by Jeffrey Schaff as the "manager" of Talisman.  Amendment ¶ 1A, ECF No.

100-6.  The Amendment states that "the Member [Schaff] shall be reclassified as the Manager" of the

LLC, and that the amended operating agreement "will govern the managers, participants, and/or

sponsors within the limited liability company."  *Id.* ¶ 1B.  Section 6 of the Amendment identifies

"Citadell Underwriters LLC" rather than Schaff as having provided the initial $500,000 capital

contribution to Talisman.  *Id.* ¶ 6.  It amends § 32 of the Operating Agreement to outline procedures

for voluntary withdrawal of a participant, replacing all procedures for voluntary withdrawal of a member. *Id.* ¶ 32. Finally, it amends § 41 of the Operating Agreement to state that Talisman "may cease operations and be dissolve[d] by unanimous vote of the participants and/or sponsors." *Id.* ¶ 41. The Amendment states that "[a]ll other sections of the . . . [Operating Agreement] remain in full force and effect," and indicates that the Amendment was made by unanimous consent of the board of directors and manager of Talisman. *Id.* at 9. In subsequent documents, including a management services agreement between Schaff and Talisman, Schaff is referred to as Talisman's "manager." ECF Nos. 100-7; 100-8.

Since January 2014, Talisman has been licensed with the Division of Insurance within the Nevada Department of Business and Industry as a sponsored captive insurance business. Def. 56.1 ¶ 38. Under Nevada law, a sponsored captive insurer "means any captive insurer . . . [t]hat only insures the risks of its participants through separate participant contracts; and . . . [t]hat funds the liability for each participant through one or more protected cells, where the assets of each protected cell are segregated from the assets of other protected cells and the assets of the general account of the sponsored captive insurer." Nev. Rev. Stat. Ann. § 694C.147 (2021). As a sponsored captive insurer, Talisman is comprised of three protected cells, all of which are licensed in Nevada. Def. 56.1 ¶ 40. Protected Cell #1, which is at issue in this action, is comprised of multiple participants, many of which are citizens of the states of New York and New Jersey. *Id.* ¶ 49.

II.   <u>Liability on the Bond</u>

31st Street ZEF, LLC ("ZEF"), the owner of the real property located at 30 East 31st Street in Manhattan, hired Plaintiff, a general contractor, to build a forty-story residential condominium on the premises. Def. 56.1 ¶¶ 2–4. On November 17, 2016, Plaintiff entered into a subcontract (the "Subcontract") with non-party NYR, whereby NYR agreed to furnish the labor, materials, and equipment necessary to supply and install windows and related hardware in the condominium. Pl.

3

56.1 ¶¶ 1, 3, ECF No. 97; Def. 56.1 ¶ 5.  The Subcontract required NYR to, among other things, "protect its own [w]ork from damage by others," and to "take all necessary precautions" to protect the work of Plaintiff and other subcontractors.  Subcontract § 4.1.7, ECF No. 96-3.[2]  Specifically, NYR was required to "[p]rotect all materials . . . from being damaged by properly carting and securing [them]" before installation, and "covering" materials left on site."  ECF No. 96-3 at 51.  In turn, Plaintiff was obligated to "provide suitable areas for storage of [NYR's] materials and equipment" during the project and reimburse NYR for any additional costs resulting from relocation if Plaintiff directed storage elsewhere.  Subcontract § 3.1.2.

Pursuant to the subcontract, NYR (as principal) and Talisman (as surety) executed and delivered to Plaintiff a $1,850,000.00 performance bond (the "Bond").  Pl. 56.1 ¶ 2.  Under the terms of the Bond, Talisman guaranteed to complete NYR's work under the subcontract if NYR defaulted or materially breached the subcontract.  *Id.*; *see generally* Bond, ECF No. 96-4.  The Bond also specifies, however, that Talisman's surety obligations arise only when there is no default by Plaintiff. Bond § 3.  Plaintiff is deemed to be in default if it fails to "pay [NYR] as required under the [Subcontract], or to perform and complete or comply" with the Subcontract's material terms.  *Id.* § 14.4.

Section 5 of the Bond requires Talisman, as surety, to investigate a claim upon notice of NYR's default, and "promptly" arrange for completion of the work, make payments to Plaintiff for Talisman's liability under the bond, or "with reasonable promptness under the circumstances . . . [d]eny liability in whole or in part and notify [Plaintiff], citing the reasons for denial.  *Id.* §§ 5, 5.4.  Section 6 of the Bond provides that if Talisman "does not proceed as provided in Section 5 with reasonable promptness, [Talisman] shall be deemed to be in default on this Bond

---

[2] References to the Subcontract also incorporate by reference superseding provisions in the Rider to the Subcontract, filed as ECF No. 96-3 at 18–44, and the Scope of Work to the Subcontract, filed at ECF No. 96-3 at 46–55.

seven days after receipt of an additional written notice" from Plaintiff "demanding that [Talisman] perform its obligations under the Bond." *Id.* § 6. Thereafter, Plaintiff is "entitled to enforce any remedy" available to it. *Id.* If, however, Talisman does "proceed as provided," and denies liability, Plaintiff is again "entitled to enforce any remedy available" without further notice to Talisman. *Id.*

The initial schedule for completion of NYR's work was set forth in Schedule F of the Subcontract. *See* Subcontract § 9.3. On March 8, 2019, NYR and Plaintiff agreed on a modified schedule for delivery and installation of the windows, which envisioned completion by June 2, 2019. Pl. 56.1 ¶ 5. In their letter confirming the modified schedule, NYR stated that the schedule was subject to "[Plaintiff] providing the upper floors of the site available for installation (free of current debris and protrusions into the window openings)." ECF No. 96-9, at 2. NYR also asked Plaintiff to "compel its contractors to remove debris from the upper floors and otherwise make installation possible . . . by removing the protrusions currently in place." *Id.* at 3.

Despite the revised schedule, delays continued to plague the project. In an email dated April 16, 2019, Plaintiff requested reimbursement from NYR for additional storage costs incurred due to the delayed installation of the windows. ECF No. 104-1, at 2. NYR responded by disclaiming liability for the delay, stating that "the upper floors are not even to this day ready to receive the custom windows." *Id.* NYR provided a link to a report "which shows numerous obstructions throughout floors 33–39 preventing [NYR] from putting in windows." *Id*.

In a letter dated May 24, 2019, NYR again stated that it could not install receptors for windows on multiple floors because it "does not have access" to those floors or because there were "materials on the floors and/or protrusions in the window openings." ECF No. 104-4 at 3. On June 10, 2019, Talisman, as surety, received a copy of a notice of default sent by Plaintiff to NYR. Pl. 56.1 ¶ 7. In a letter dated June 13, 2019, NYR stated to Plaintiff that its allegations were "inaccurate and untrue," citing Plaintiff's "failure to provide NYR with sufficient access [and] properly

5

sized . . . openings, among other . . . issues." ECF No. 104-5 at 1. It further described Plaintiff's

"delays including . . . materials and scaffolding being on the floors . . . and the openings not being

ready to accept NYR's work." *Id.* at 2–3.

In an email dated July 12, 2019, Plaintiff threatened to terminate the Subcontract for cause

if NYR did not deliver the windows within three days. ECF No. 96-15 at 5. Plaintiff also stated that

NYR had "intentionally delayed this project" by taking possession directly of the windows rather

than delivering them to the site. *Id.* The same day, NYR responded by email, calling Plaintiff's

claims "completely false," and stating that "there are many obstructions onsite" that were preventing

delivery and installation of the windows. *Id.* at 3. NYR's email detailed several other issues that

needed remedial action from Plaintiff before NYR could safely deliver and install the windows. *See*

*id.* at 3–4. This included Plaintiff "not giv[ing] NYR enough room to store . . . [the] windows"

onsite, which required NYR to store the widows offsite "so they are not damaged." *Id.* at 4. NYR

also stated it had attached photographs "that clearly show[] [that] the floors are not free and clear of

debris and materials to perform any installation [or] store materials." *Id.* In a subsequent email on

the same date, NYR said that the windows would be delivered that Friday, pending a walk-through

with the building super "in order to clear the path for [it] to install the windows." *Id.* at 2.

In a July 16, 2019 email exchange between NYR and Plaintiff, NYR noted that it was

"amazing how every time [it has] asked to walk[] [through] the building, [it was] denied." ECF No.

96-18, at 5. The next day, NYR's principal, Monique Delacroix, asked to meet with Plaintiff to "find

a path to successfully finish the job," to which Plaintiff retorted that NYR should stop "playing

games" and deliver the windows. *Id.* at 3–4. Delacroix then responded, describing NYR's

willingness to "deliver windows for the openings that are [al]ready inspected," detailing work on

Plaintiff's part that would need to take place before the remaining windows could be installed, and

stating that NYR "need[s] room to work," and could not "work around" a lack of access. *Id.* at 2.

Plaintiff then threatened to terminate the Subcontract the following day if the windows were not delivered by then.  *Id.*

On July 15, 2019, Plaintiff sent a second cure notice to NYR and Talisman.  Pl. 56.1 ¶ 21. By letter dated July 18, 2019, NYR stated to Plaintiff that Plaintiff "has done nothing to alleviate [its] concerns," citing, among other things, "obstructions in the window openings," "materials and other items strewn about . . . [and] preventing the delivery [and storage] of the windows from the hoist." ECF No. 104-6 at 2.  By letter dated July 19, 2019, Plaintiff terminated the subcontract, Def. 56.1 ¶ 10.  In a letter to Talisman that same day, Plaintiff advised Talisman of NYR's default and demanded that Talisman, as surety, act under the Bond to complete NYR's work.  Pl. 56.1 ¶ 26.  On July 24, 2019, Talisman acknowledged the claim, and directed Plaintiff to provide additional information, including documentation to "demonstrat[e] the validity of the claim."  ECF No. 96-21 at 2.  On August 5, 2019, Plaintiff provided the requested documents, and "again demand[ed] that [Talisman] promptly take action."  ECF No. 96-22.  The same day, Plaintiff sent Talisman a second letter reiterating its demand that Talisman take action and telling Talisman to construe the letter as Talisman's "fifteen (15) day notice under paragraph 5 of the Bond."  ECF No. 96-23.  Sometime in August 2019, Talisman and Plaintiff held a telephone conference to discuss the claim.  Tolbert Decl. ¶ 60, ECF No. 96.  By letter to Plaintiff dated August 21, 2021, Talisman disclaimed liability, stating that Plaintiff "is in default" under the Subcontract, and that "[t]herefore, Talisman has no obligation" under the Bond.  ECF No. 103-1, at 2.  The basis for Plaintiff's default, among other issues, was "[Plaintiff's] failure to provide clean, accessible, organized and safe conditions for installation of windows by [NYR]," which "made performance by [NYR] impossible or unsafe."  *Id.* at 3.

On August 28, 2019, Plaintiff commenced this action.  ECF No. 1.  On March 16, 2020, Talisman moved to dismiss the complaint, arguing that this Court lacks jurisdiction over the dispute. ECF No. 40.  On July 30, 2020, the Honorable Sarah Netburn issued a report and recommendation

that the Court deny the motion without prejudice to renewal after the parties completed additional jurisdictional discovery, ECF No. 71, which the Court adopted in full on September 30, 2020, ECF No. 83.  On April 1, 2021, Plaintiff moved for summary judgment on the issue of liability only, seeking a trial on damages.  Pl. Mot.  On April 10, 2021, Talisman cross-moved for summary judgment on the ground that the Court lacks jurisdiction over this matter.  Def. Mot.

## DISCUSSION

I.    Standard of Review

A.   Summary Judgment

Summary judgment is appropriate when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986).  A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  The moving party initially bears the burden of informing the court of the absence of a genuine dispute of material fact by citing particular evidence in the record.  Fed. R. Civ. P. 56(c)(1); *see also Celotex*, 477 U.S. at 323–24; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002).  If the nonmoving party has the ultimate burden of proof on specific issues at trial, the movant may also satisfy its own summary judgment burden by demonstrating that the adverse party cannot produce admissible evidence to support an issue of fact.  *See Celotex*, 477 U.S. at 322–23; *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).  If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine dispute of material fact.  *Beard v. Banks*, 548 U.S. 521, 529 (2006); *PepsiCo*, 315 F.3d at 105.  In doing so, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation," *Scott v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998), as "unsupported allegations do not create a material issue of fact,"

8

*Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).  In deciding the motion, the court views the record in the light most favorable to the nonmoving party.  *Koch*, 287 F.3d at 165.

       B.  Rule 12(b)(1)

The issue of subject matter jurisdiction may be raised at any point in the litigation.  Fed. R. Civ. P. 12(h)(3).  Motions to dismiss a complaint for lack of subject matter jurisdiction are typically made pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, rather than as motions for summary judgment under Rule 56.  *Brennan v. G.S.A. Ltd.*, No. 97 Civ. 6950, 1999 WL 92547, at *3 (S.D.N.Y. 1999); *see also Kantor v. Comet Press Books Corp.*, 187 F. Supp. 321, 322 (S.D.N.Y. 1960); 10 Charles Alan Wright & Arthur R. Miller, Fed. Practice and Procedure § 2713 (4th ed. 2021) (noting that generally, "courts have ruled that summary judgment is an inappropriate vehicle for raising a question concerning the court's subject matter jurisdiction.").  This is so because summary judgment typically resolves a case on its merits, which may bar further re-litigation of the case in an appropriate forum, whereas a dismissal for lack of jurisdiction under Rule 12 has no such preclusive effect.  *See* Wright & Miller § 2713.  Accordingly, the Court shall construe Defendant's motion for summary judgment as a renewed motion to dismiss the complaint under Rule 12(b)(1).  *See Brennan*, 1999 WL 92547, at *3.

Rule 12(b)(1) requires the Court to dismiss an action for lack of subject matter jurisdiction when it lacks the statutory or constitutional power to adjudicate the case.  Fed. R. Civ. P. 12(b)(1); *see also Frisone v. Pepsico, Inc.*, 369 F. Supp. 2d 464, 469 (S.D.N.Y. 2005).  The party asserting subject matter jurisdiction bears the burden of proving, by a preponderance of the evidence, that such jurisdiction exists.  *Phoenix Four, Inc. v Strategic Resources Corp.*, 446 F. Supp. 2d 205, 211–12 (S.D.N.Y. 2006).  When deciding a Rule 12(b)(1) motion, the Court may resolve disputed jurisdictional facts by referring to evidence outside the pleadings.  *Zappia Mid. E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000).  Accordingly, the Court may base its

decision "on the basis of affidavits or other evidence, and no presumptive truthfulness attaches to the complaint's jurisdictional allegations." *Frisone*, 369 F. Supp. 2d at 469–70 (quotation marks and citation omitted). Doubts as to the existence of federal jurisdiction must be resolved in favor of state court jurisdiction. *Lupo v. Human Affairs Int'l, Inc.*, 28 F.3d 269, 274 (2d Cir. 1994).

II.    Subject-Matter Jurisdiction

As a threshold matter, the Court must resolve Talisman's jurisdictional objections before it may consider the merits of Plaintiff's motion for summary judgment. *Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 94 (1998).

District courts have original jurisdiction of all civil actions where the matter in controversy exceeds $75,000 in value, and where the matter arises between "citizens of different States[.]". 28 U.S.C. § 1332(a)(1). Subject-matter jurisdiction predicated on diversity of citizenship requires "complete diversity," that is, "all plaintiffs must be citizens of states diverse from those of all defendants." *Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co., Inc.*, 772 F.3d 111, 117–18 (2d Cir. 2014) (citation omitted). In deciding whether there is complete diversity, the Court looks to citizenship of the parties on the date Plaintiff commenced the action; subsequent changes of citizenship do not destroy diversity. *See LeBlanc v. Cleveland*, 248 F. 3d 95, 100 (2d Cir. 2001).

An LLC is a citizen of every state of which any of its members is a citizen. *Handelsman v. Bedford Vill. Assocs. Ltd. P'ship*, 213 F.3d 48, 51–52 (2d Cir. 2000). Accordingly, where an LLC is named as a party, a plaintiff must demonstrate the citizenship of all natural persons who are members of the entity, as well as the place of incorporation and principal place of business of any corporate entities that are members of the entity, to enable the court to determine whether it has subject-matter jurisdiction over the action. *Mills 2011 LLC v. Synovus Bank*, 921 F. Supp. 2d 219, 220–21 (S.D.N.Y. 2013). Though the caselaw on this issue is sparse, where an LLC has no members, some courts have deemed such entities "stateless" for the purposes of citizenship, such that diversity

10

jurisdiction cannot exist.  *E.g.*, *Nat'l. W.W. II Museum, Inc. v. Talisman Cas. Ins. Co.*, *LLC*, 19 Civ. 13279, 2020 WL 563635, at *2 (E.D. La. Feb. 5, 2020) (collecting cases); *Broadbridge Fin. Sols., Inc. v. CNBS, LLC*, No. 15 Civ. 4978, 2016 WL 1222339, at *1 (S.D.N.Y. Mar. 23, 2016).  Talisman argues the Court lacks subject-matter jurisdiction over this action, either because (1) Talisman has no members, and is therefore considered "stateless" for purposes of diversity jurisdiction; or in the alternative, (2) because Talisman's "participants" are its members, and some Talisman members share states of citizenship with Plaintiff.  Def. Mem. at 4–5, ECF No. 101.  The Court disagrees on both grounds.

A.  Statelessness

Talisman first argues that it has no members and is therefore considered "stateless" for purposes of diversity jurisdiction.  *Id.*  Plaintiff counters that Jeffrey Schaff, a citizen and resident of Louisiana, is Talisman's member pursuant to the company's initial operating agreement; that Schaff remains its sole member because he never validly withdrew or resigned his membership; and that Talisman has represented in this litigation and before other federal courts that it is a citizen of Louisiana by virtue of Schaff's citizenship.  Pl. Opp. Mem. at 9–16, ECF No. 108.  Plaintiff argues, therefore, that there is complete diversity between the parties.  *Id.*  The Court agrees.

The parties do not dispute that Talisman's operating agreement, executed on January 24, 2014, identifies Schaff as Talisman's "sole member," Def. 56.1 ¶ 23, that Talisman was validly incorporated as an LLC under Nevada law, with Schaff identified as the "organizer" of the LLC, *id.* ¶¶ 16, 20, and that Talisman remains an LLC in good standing under the laws of the state of Nevada, *id.* ¶ 21.  The operative question here is whether Schaff was a "member" of Talisman on the date the complaint in this action was filed.  *LeBlanc*, 248 F. 3d at 100.  This question "is ultimately governed by the law of the state of incorporation."  *Dumann Realty, LLC v. Faust*, No. 09 Civ. 7651, 2013 WL 30672, at *2 (S.D.N.Y. Jan. 3, 2013).  Talisman was incorporated in Nevada, *see* Def. 56.1 ¶ 14, and

therefore, Nevada law governs. *See Americold Realty Tr. v. Conagra Foods*, 577 U.S. 378, 381–82 (2016) (looking to "specific States' laws" to define "members" of an unincorporated entity for purposes of determining diversity jurisdiction).

Under Nevada law, a "member" of an LLC is either the owner of a "member's interest," Nev. Rev. Stat. Ann. § 86.081, which is a share of the economic interests of the LLC, including profits, losses, and distributions of assets, *id.* § 86.091, or a "noneconomic member," who does not own a member's interest or have an obligation to contribute capital, and does not have a right to participate in, or receive distributions from the company, *id.* § 86.095. Nevada law requires that an LLC maintain one or more members "at all times" after the commencement of business. *Id.* § 86.151(3). Indeed, with minimal exceptions, Nevada law requires dissolution of an LLC when it ceases to have any members. *Id.* §§ 86.491(1)(e), (2)(e). Nevada law further bars members from "resign[ing] or withdraw[ing] as a member from [an LLC] before the dissolution and winding up of the company," unless resignation or withdrawal is expressly provided for in the company's articles of organization, the operating agreement, or other applicable law. *Id.* § 86.331(1). And finally, Nevada law states that, unless provided otherwise by statute or the LLC's operating agreement or articles of incorporation, the "resignation . . . dissolution or disassociation of a member or any event affecting a member, including . . . a sole member, does not . . . [t]erminate the status of the person as a member; or . . . [c]ause the [LLC] . . .to be dissolved . . . ." *Id.* § 86.491(4).

Because Talisman is a manager-managed LLC, *see* Articles of Organization, its initial member is admitted "as of the time set forth in and upon compliance with the operating agreement." Nev. Rev. Stat. Ann. § 86.326(1)(b). And an individual may be admitted as "the sole member of [an LLC] . . . [w]ithout acquiring a member's interest in the company; or [w]ithout making or being obligated to make a contribution to the capital of the company." *Id.* § 86.326(5).

Pursuant to Nevada law, Schaff was admitted as Talisman's member as of January 24,

2014, the date set forth in the Operating Agreement.  *Id.* § 86.326; Operating Agreement at 1.  Two days later, Talisman adopted the Amendment to the Operating Agreement, which "reclassified" Schaff as Talisman's "manager" rather than its "sole member," Amendment ¶ 1A, and generally removed references to "members" from the Operating Agreement, *see generally*, *id.*  The Amendment also removed the procedure outlined in the Operating Agreement allowing for the voluntary withdrawal of a member by providing written notice, instead replacing this section with procedures for the voluntary withdrawal of a participant.  *Compare* Amendment ¶ 32, *with* Operating Agreement ¶ 32.

Talisman argues that based on the Amendment, Schaff "was only a manager of Talisman at the time the [c]omplaint in this action was filed, on August 28, 2019, and was not a 'member' nor did he have a 'member's interest' in Talisman" as of that date.  Def. Mem. at 12.  But the Court does not find that Talisman's adoption of the Amendment, or its "reclassification" of Schaff as Talisman's "manager," constitutes a valid withdrawal or resignation of Schaff's membership.  Nevada law is clear on this point: unless specifically provided for by an LLC's articles of incorporation, operating agreement, or other relevant law, a member cannot withdraw or resign from the LLC prior to the dissolution or winding-up of the LLC.  Nev. Rev. Stat. Ann. § 86.331 (1).  Nevada law is similarly clear that "disassociation . . . or any other event affecting a member" does not terminate the status of a person as a member, except as otherwise provided by the LLC's operational documents.  *Id.* § 86.491(4).  And there is no dispute that Schaff plainly did not comply with the member withdrawal procedures initially stipulated in the Operating Agreement—specifically, providing written notice, and waiting until at least six months following the date of execution of the Operating Agreement.  *See* Operating Agreement ¶ 32.  The Amendment replaces the member withdrawal procedures with procedures governing the withdrawal or resignation of Talisman's participants—which indisputably do not cover Schaff.  Amendment § 32.  The Operating Agreement as amended, therefore, contains

13

no procedures permitting the withdrawal or resignation of Talisman's members. *See generally id.* And, Talisman identifies no provision in the Articles of Organization, or other relevant Nevada law that otherwise permitted Schaff to withdraw or resign as member simply by being "reclassified" as a manager. Therefore, Talisman's adoption of the Amendment and "reclassification" of Schaff as Talisman's manager cannot be construed as an effective withdrawal or resignation of Schaff's membership in Talisman.

Talisman argues that Schaff's membership was "always intended to be interim until Talisman was authorized as a sponsored captive insurer." Def. Reply Mem. at 6, ECF No. 114. But Talisman does not explain how its authorization as a sponsored captive insurer excuses it from complying with Nevada law requiring an LLC in good standing to have at least one member. Talisman has not, for instance, adduced evidence showing that its participants or sponsor are identified as "members" in Schaff's stead in organizational documents, or in Talisman's representations to the Nevada Secretary of State.

In short, Talisman was incorporated as an LLC based on the representation that Schaff was its sole member. Schaff did not withdraw or resign his membership in a manner that complied with the procedure set forth in the Operating Agreement. Talisman's subsequent governing documents, including the Amendment and the Articles of Organization, provide only for the voluntary withdrawal of participants, and are silent on withdrawal procedures for members. Thus, Nevada law governs here. Nev. Rev. Stat. Ann. § 86.491(4). Nevada law makes clear that unless an LLC's operational documents provide otherwise, members may not withdraw or resign from an LLC until the LLC has been dissolved or wound down. *Id.* § 86.331(1). Nevada law further makes clear that even the "resignation" or "disassociation" of a member from an LLC does not terminate his or her membership. *Id.* § 86.491(4). Indeed, Nevada law requires the dissolution of an LLC when it ceases to have any members. *Id.* §§ 86.491(1)(e), (2)(e). Yet, Talisman is—and has always been—

an LLC in good standing in the state of Nevada.  Def. 56.1 ¶ 21.  Because Talisman has not been

dissolved, it logically follows that Schaff remains Talisman's "sole member" and thus, his citizenship

is determinative of Talisman's citizenship.

Talisman urges this Court to follow the lead of the United States District Court for the

Eastern District of Louisiana, which concluded that Talisman was "stateless" for purposes of

diversity jurisdiction based solely on an affidavit supplied by Talisman stating that it had no

members.  *Nat'l. W.W. II Museum*, 2020 WL 563635, at *2.  But the decisions of other district courts

do not bind this Court.  *Arcuelo v. On-Site Sales & Marketing*, *LLC*, 321 F. Supp. 2d 604, 609

(S.D.N.Y. 2004).  And the Louisiana court's decision was heavily guided by *ConnectU LLC v.*

*Zuckerberg*, or cases relying on it.  *See Nat'l. W.W. II Museum*, 2020 WL 563635, at *2 (citing

*ConnectU LLC v. Zuckerberg*, 482 F. Supp. 2d 3 (D. Mass. 2007), *rev'd on other grounds* 522 F.3d

82, 96 (1st Cir. 2008)).  In *ConnectU*, a court in the District of Massachusetts concluded that an LLC

was "stateless" because it had no members at the time of its formation, but it also expressly noted

that, under Delaware law, which governed the incorporation, such a structure was "perfectly

acceptable . . . and does not in any manner implicate the validity of the LLC."  *Id.* at 20.  The

*ConnectU* court, therefore, looked to the laws of the state of incorporation, rather than merely the

parties' self-serving statements, to determine diversity.  Here, the Court cannot conclude that

Talisman is "stateless" without implicating the validity of the LLC—and as explained, a plain reading

of Nevada law compels the logical conclusion that Schaff remains Talisman's member, absent proof

of a statutorily valid withdrawal or resignation.

Finally, the Court's conclusion that Schaff is Talisman's member is bolstered by

*Talisman*'s own repeated statements—both to this Court, as well as to other federal district courts—

that Schaff remains its member.  In this action, Talisman initially filed a Rule 7.1 Corporate

Disclosure statement identifying itself as a "Nevada [LLC] whose sole member is [Schaff], a resident

and citizen of the State of Louisiana." ECF No. 16. Talisman subsequently filed an amended disclosure statement omitting the reference to Schaff as a member, ECF No. 26, and represented to the Court that its counsel "had been misinformed" when the initial disclosure statement was filed, ECF No. 27 at 1. Talisman acknowledges it has "assert[ed] inconsistent positions" with respect to its own citizenship in other litigations, but similarly chalks this up to "attorney error." Def. Reply at 10. *Compare* Notice of Removal, *KIS Surety Bonds, LLC v. Talisman Casualty Ins. Co., LLC et al.*, No. 19 Civ. 80356 (S.D. Fl. Mar. 14, 2019) (notice of removal in Florida action stating "Talisman . . . is considered a citizen of Louisiana . . . [I]ts sole member is a resident of, and domiciled in, Slidell, Louisiana."), *with Nat'l. W.W. II Museum, Inc.*, 2020 WL 563635, at *2 ("Talisman has supplied an affidavit attesting that it has no members."). Talisman's "selective invocation of federal jurisdiction is a waste of its insureds' time and resources, as well as that of the courts." *McKenzie v. Farmers Ins. Exchange*, No. 17 Civ. 4011, 2018 WL 801597, at *4 (D.S.D. Feb. 8, 2018). The Court will not countenance such chicanery by discarding the weight of Plaintiff's factual evidence and the plain reading of Nevada law in favor of Talisman's self-serving affidavits claiming statelessness.

The Court concludes that Schaff, a citizen and resident of Louisiana, was Talisman's sole member at the time the complaint in this action was filed. Talisman is, therefore, a citizen of Louisiana and in complete diversity with Plaintiff, who is a citizen of New York and New Jersey. Accordingly, Talisman's motion to dismiss the complaint on this basis is DENIED.

B. Participants as Members

In the alternative, Talisman argues that, as a sponsored captive insurer, it is "owned" by the participants of each of its three protected cells, and therefore, the Court should find that its "members" are its participants. Def. Mem. at 13–15. Should the Court so find, diversity would be destroyed because some of Talisman's participants are citizens of the same states as Plaintiff. *Id.* The Court again finds Talisman's argument unavailing.

As a sponsored captive insurer, Talisman is an LLC that houses three protected cells and their participants.  Def. 56.1 ¶ 40.  Talisman does not identify its participants as its "members" in the Operating Agreement, the Amendment, its Articles of Incorporation, or any other operative documents.  Accordingly, the Court may examine contracts and agreements linking the participants to Talisman to determine whether they should be considered "members" of Talisman for purposes of diversity jurisdiction.  *See Cordts-Auth v. Crunk, LLC*, 479 F. App'x 375, 379 (2d Cir. 2012).

Under Nevada law, a sponsored captive insurer "funds the liability for each participant through . . . protected cell[s] where the assets of each protected cell are segregated from the assets of other protected cells and the assets of the general account of the sponsored captive insurer."  Nev. Rev. Stat. Ann. § 694C.147(4).  Similarly, a protected cell is defined as a "separate account established by a sponsored captive insurer in which assets are maintained for one and more participants" in accordance with the terms of participant agreements or contracts "that fund the liability of the sponsored captive insurer assumed on behalf of the participants."  *Id.* § 646C.117.  The participant's losses are "limited by a participant contract to the participant's pro rata share of the assets of one or more protected cells" pursuant to the terms of its participant agreement.  *Id.* § 694C.113.

An examination of the relevant contracts and agreements between Talisman and its participants does not support a finding that the participants are owners of Talisman.  The Amendment, for instance, which "govern[s] the . . . participants and sponsors" of Talisman, provides that participants "shall own a pro rata share of the assets of the protected cell."  Amendment ¶ 1A.  Nevada law makes clear that a protected cell is a "separate account" established by Talisman, as the sponsored captive insurer, and that the assets of the protected cell are separately maintained from the general assets of Talisman.  Nev. Rev. Stat. Ann. §§ 694C.117, 646C.147.  Owning assets of the protected cell does not, therefore, equate to an ownership stake in the general assets of Talisman as an

17

LLC.

Similarly, the governing Participation Agreement between Talisman and NYR makes clear that participants may be entitled to profits, losses, and distributions of the specific protected cell, but not those of Talisman.  For example, the Participation Agreement notes that participants "will participate solely in the profits and losses of [the protected cell] . . . and not in any other [protected cell] nor in 'core cell' or any other property of [Talisman]."  Participation Agreement § 2.2, ECF No. 100-14.  It similarly notes that participants "will not be entitled to share in any profits" of either Talisman or other protected cells besides the one they belong to.  *Id.* § 2.3.  Upon "winding up" of either the protected cell or Talisman, participants are entitled to distribution of the assets of only the protected cell, and "will not be entitled to share in any other assets of [Talisman] available for distribution."  *Id.* § 2.6.  Given the clear delineation between the assets, profits, and distributions of the protected cell on one hand, and those of Talisman on the other, there is no basis to conclude that, by virtue of the participants' entitlement to the former, that they own a share of Talisman's general economic interests.

The Participation Agreement also specifically distinguishes between Talisman's "participants," and its "members."  *Id.* §§ 2.8, 3 4.  It states, for instance, that Talisman is subject to the "supervision and discretion of the Members of the Company" when making investment and asset divestment decisions for participants.  *Id.* § 2.8.  And finally, the Participation Agreement limits the authority of participants, by specifying that participants "shall have no authority to bind, obligate, or represent" either Talisman or their protected cell "in any respect."  *Id.* § 8.2.  Inherent in the notion of "ownership" is the ability to make decisions and exercise control on behalf of the entity one owns. *See Americold*, 577 U.S. at 382.  Participants have no such authority over Talisman, and therefore cannot be considered Talisman's owners.

Talisman has not demonstrated that its participants are identified as "members" in any of

its operative documents.  It also has not shown that its participants own or share in the assets, profits and losses, or distributions of Talisman—only that they are entitled to such interests in the specific protected cell of which they are participants.  And both Talisman's Participation Agreement and Nevada law demonstrate a clear delineation between the assets of the protected cell and of Talisman generally.  According, the Court finds that Talisman's participants are not its members for the purposes of diversity jurisdiction, and Talisman's motion to dismiss for lack of subject-matter jurisdiction on this basis is DENIED.

III.   <u>Liability for Default</u>

Plaintiff seeks summary judgment on the issue of Talisman's liability for the expenses Plaintiff incurred completing NYR's work on the Subcontract.  Pl. Mem. at 9–16, ECF No. 98.  Talisman maintains that an issue of fact exists as to whether Plaintiff was in default on the Subcontract, which precludes Talisman's liability under the Bond.  Def. Opp. Mem. at 14, ECF No. 105.  The Court agrees.

A bond is a contract, and the Court must "look to standard principles of contract interpretation to determine the rights and obligations of a surety under a bond." *United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 51 (2d Cir. 2004).  "One of these principles is that, before a surety's obligations under a bond can mature, the obligee must comply with any conditions precedent." *Id.*  The terms of the Bond should be given their "plain, ordinary, and proper meaning," to the extent they are unambiguous. *General Ins. Co. of Am. v. K. Capolino Const. Co.*, 903 F. Supp. 623, 627 (S.D.N.Y. 1995) ("*Capolino*") (quoting *Dupack v. Nationwide Leisure Corp.*, 424 N.Y.S. 2d 436, 439 (N.Y. 1980).  The Bond here unambiguously states that Talisman's obligations arise only "if there is no . . . [d]efault" by Plaintiff under the Subcontract.  Bond § 3.  Therefore, Talisman is obligated to complete the contracts only if Plaintiff is not in default. *Capolino*, 903 F. Supp. at 627.

19

Under the Bond, Plaintiff is in default if they fail to "pay [NYR] as required under the [subcontract] or to perform and complete or comply" with the Subcontract's material terms.  Bond § 14.4.  The Subcontract requires, among other things, that NYR and Plaintiff "shall cooperate . . . in scheduling and performing [NYR's] [w]ork to reasonably avoid conflicts or interference" in Plaintiff's work or the work of other subcontractors.  Subcontract § 3.1.1.  The Subcontract further requires Plaintiff to "provide suitable areas for storage of [NYR's] materials and equipment" during the project.  *id*. § 3.1.2.  Moreover, as parties to a construction contract, under New York law, it is understood that NYR and Plaintiff "impliedly agree[d] not to hinder or obstruct the other's performance [and] . . . each party ha[d] an affirmative obligation to facilitate the other's performance."  *See also Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1007 (2d Cir. 1991)

Plaintiff argues that NYR materially breached the Subcontract by, among other things, failing to deliver and install windows by the stipulated deadline of June 2, 2019, delaying delivery of the windows by failing to pay their supplier and fabricator; and then "unilaterally decid[ing] not to deliver" the windows or their hardware to Plaintiff once the windows were shipped to the United States.  *Id.* at 10–13.  And, Plaintiff contends that it is "undisputed that there were no defaults by Plaintiff."  Pl. Mem. at 10.  But, a review of the record casts doubts on this assertion.

Talisman has adduced evidence, including affidavits, photographs, contemporaneous communications between NYR and Plaintiff, and deposition testimony, that NYR's failure to deliver and install the windows was predicated on Plaintiff's alleged failure to clear debris and remove obstructions from the installation site, and to provide a safe method of delivery and means of storing the windows once delivered.   The record demonstrates that, as early as March 2019, NYR raised its concerns to Plaintiff.  *See, e.g.*, Pirvulescu Aff. ¶ 15, ECF No. 104.  On March 8, 2019, NYR and Plaintiff agreed on a modified schedule for delivery and installation, which NYR stated was subject

to "[Plaintiff] providing the upper floors of the site available for installation (free of current debris and protrusions into the window openings)." ECF No. 96-9. NYR also asked Plaintiff to "compel its contractors to remove debris from the upper floors and otherwise make installation possible . . . by removing the protrusions currently in place." *Id.* at 2. Over the next three months, email communications between NYR and Plaintiff demonstrate that NYR repeatedly advised Plaintiff that delivery and installation of the windows was impracticable due to debris on the installation floors, protrusions in the openings meant for window installation, and a lack of a secure place to store the windows upon delivery. *E.g.*, ECF Nos. 104-1, at 2; ECF No. 104-4 at 3; ECF No. 104-5; *see also* Pirvulescu Aff. ¶¶ 12–34. Similarly, in deposition testimony, NYR employees testified that conditions at the construction site were unsafe, because of "obstructions" preventing window installation and the lack of a "clear path" to deliver the windows. Pirvulescu Tr. at 67, ECF No. 107-9. "There is, therefore, a triable issue as to whether [NYR and Talisman's] interests were adversely affected by any failure of [Plaintiff] substantially to perform [its] obligations under the construction contracts and the bonds." *Hunt v. Bankers & Shippers Ins. Co. of New York*, 400 N.Y.S.2d 645,647 (N.Y. App. Div. 1977). Although Plaintiff clearly disputes the veracity of these assertions, it is established law that "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).

Plaintiff argues that even if the alleged debris or obstructions prevented installation of the windows, NYR was not precluded from delivering and storing the windows, and, therefore, Plaintiff's failure to clear such debris does not constitute a default of their contractual obligations. Pl. Reply at 7, ECF No. 111. But, under the terms of the Subcontract, NYR would have been in breach—and thus exposed to liability—if it failed to "protect its own [w]ork from damage by others," by properly securing, storing, and covering the windows, or if it failed to "take all necessary precautions" to

protect the work of Plaintiff or other subcontractors.  Subcontract § 4.1.7.  And, in deposition testimony, NYR employees noted that delivering and sorting the windows in areas identified by Plaintiff would have created unsafe conditions that would have caused a shutdown of the site; that delivering windows to high floors of the building was a dangerous process that would have been further complicated with debris or obstructions blocking access; and that individual rooms in certain areas were too small to permit adequate egress and storage of the windows.  Pirvulescu Tr. at 56, 72–73.  Given NYR's liability for damage to the windows arising from improper storage, a reasonable jury could conclude that Plaintiff's failure to provide an unobstructed delivery and storage area constituted default of its obligations under the Subcontract to provide NYR with adequate and safe storage space; and its implicit duty not to obstruct NYR in the performance of its work.

Finally, Plaintiff argues that Talisman has not established entitlement to the defense of impossibility to excuse its performance on the bond.  Pl. Reply at 4–13.  But this appears to muddle the arguments before the Court.  Impossibility is an affirmative defense—that is, a party may invoke it to seek relief from compliance with a contract once there is "no dispute" that the party has breached the contract at issue.  *See Bank of New York v. Try Polyta Finance B.V.*, No. 01 Civ. 9104, 2003 WL 1960587, at *4 (S.D.N.Y. Apr. 25, 2003).  Here, Talisman is not invoking an affirmative defense following a breach of its obligations—rather, it argues that its obligations under the Bond were never triggered in the first place.  Def. Opp. Mem. at 10–14.  Because the Court has determined that disputes of material fact preclude summary judgment on the question of Talisman's liability under the bond, it need not consider, at this stage, whether Talisman has proffered facts sufficient to establish a defense to such liability.  This is particularly so given that "the question of impossibility under New York law is inherently fact-specific, and thus should be resolved by the jury at trial."  *Clarex Ltd. v. Natixis Secs. Am. LLC*, 988 F. Supp. 2d 381, 394 (S.D.N.Y. 2013).

Accordingly, Plaintiff's motion for summary judgment as to liability is DENIED on the

ground that there remain genuine disputes of material fact as to whether Plaintiff defaulted on its obligations under the subcontract, and correspondingly, whether Talisman's liability on the Bond was triggered.

IV.   Timely Investigation of Claim

Plaintiff argues that Talisman separately defaulted by "failing to timely render a determination of Plaintiff's claim" within the timeframe set forth by the Bond, and that Plaintiff is accordingly entitled to summary judgment on the issue of liability on this basis. Pl. Mem. at 2, 16–18. Section 5.4 of the Bond requires Talisman, as surety, to investigate a claim upon notice of the contractor's default, and "promptly" arrange for completion of the work, make payments to Plaintiff for its liability under the bond, or "with reasonable promptness under the circumstances . . . deny liability in whole or in part, and notify [Plaintiff], citing the reasons for denial." Bond §§ 5, 5.4. The Bond then provides that if Talisman "does not proceed as provided in Section 5 with reasonable promptness, [Talisman] shall be deemed to be in default on this Bond seven days after receipt of an additional written notice" from Plaintiff "demanding that [Talisman] perform its obligations under the Bond." Bond § 6. Thereafter, Plaintiff is "entitled to enforce any remedy" available to it. *Id.* If, however, Talisman does "proceed as provided," and denies liability, Plaintiff is again "entitled to enforce any remedy available" without further notice to Talisman. *Id.*

Based on the record, the Court cannot conclude that Talisman failed to act with reasonable promptness in adjudicating Plaintiff's claim. At the outset, a precondition to Talisman's obligations under § 5 of the Bond is that there is "no . . . default" by Plaintiff, Bond § 3, and, as the Court has made clear, it remains an open question as to whether Plaintiff's actions constituted such a default. Next, Talisman acknowledged Plaintiff's claim within five days of the date of Plaintiff's claim letter, and resolved Plaintiff's claim within a month. *Compare* ECF No. 96-20 (initial claim letter dated July 19, 2019), *with* ECF No. 96-21 (Talisman's acknowledgment of claim on July 24, 2019), *and*

23

ECF No. 103-1 (Talisman's letter resolving claim fully, dated August 21, 2021). Section 5.4 of the Bond expressly empowers Talisman to, "with reasonable promptness," undertake an investigation and either make payment of its obligations or deny liability with notification to Plaintiff. Bond § 5.4. Talisman's commencement of the investigation within five days of Plaintiff's initial claim letter is consistent with its obligations under the Bond.

Section 6 of the Bond states that Talisman "shall be deemed to be in default" if it "does not proceed as provided in Section 5 with reasonable promptness . . . seven days after receipt of an additional written notice" from Plaintiff demanding that Talisman perform its obligations. Bond § 6. Plaintiff construes the two letters it sent on August 5, 2019—one of which provided Talisman with the documents it required to investigate Plaintiff's claim—as the required "notice" under this provision. ECF Nos. 96-22, 96-23, But, by this date, Talisman had already undertaken investigation of Plaintiff's claim, thus "proceed[ing] as provided . . . with reasonable promptness" under the Bond's terms. Bond § 6.

Finally, even if the Court assumes for the sake of argument that Talisman's one-month adjudication of Plaintiff's claim was not "reasonably prompt," the Bond only deems Talisman in default to the extent that Plaintiff is empowered to "enforce any remedy" available to them, presumably including commencing litigation. *Id.* § 6. The Bond's plain language does not further compel the Court to deem Talisman in default and enter summary judgment as to liability without more, particularly when, as here, there remain factual disputes as to whether Talisman's liability under the Bond was even triggered. Accordingly, Plaintiff's motion for summary judgment as to Talisman's liability on the Bond on this ground is DENIED.

24

## CONCLUSION

For the reasons stated above, the parties' cross-motions for summary judgment are DENIED.

The Clerk of Court is directed to terminate the motions pending at ECF Nos. 95 and 99.

SO ORDERED.

Dated: March 2, 2022
       New York, New York

_____
ANALISA TORRES
United States District Judge