UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E & T SKYLINE CONSTRUCTION, LLC, <br><br>     Plaintiff, <br><br>     -v- <br><br> TALISMAN CASUALTY INSURANCE COMPANY, LLC, <br><br>     Defendant. | 19-cv-8069 (JSR) <br><br> FINDINGS OF FACT AND CONCLUSIONS OF LAW |

JED S. RAKOFF, U.S.D.J.:

This case concerns a construction dispute about the installation of custom windows, imported from Italy, at a luxury condominium building in Manhattan. Plaintiff E & T Skyline Construction, LLC ("E&T"), the general contractor responsible for the building's construction, hired subcontractor NY Renaissance Corp. ("NYR") to deliver and install the windows. To cover its losses in case NYR failed to perform, E&T obtained a performance bond of $1,850,000 from defendant Talisman Casualty Insurance Company, LLC ("Talisman"). As it turned out, E&T terminated NYR for default and came knocking to Talisman to pay the bond. Talisman refused, pointing to E&T's own failure to fulfill each of its obligations under the bond agreement, which was a precondition for Talisman's payment. E&T sued Talisman for breach of the bond agreement, and the Court held a four-day bench trial. The Court now holds that Talisman is not liable, and sets forth the following findings of fact and conclusions of law.

I.  Findings of Fact

1

Based on the parties' joint statement of facts, exhibits, deposition designations, and -- critically -- the trial testimony and the Court's assessment of the witnesses' demeanor and credibility, the Court makes the following factual findings:

1. E&T was the general contractor of a project (the "Project") to construct a 40-story condominium building located at 30 East 31st Street in Manhattan. Tr. 6, 25.[1]

2. On November 17, 2016, E&T entered into a subcontract with NYR to deliver and install rectangular windows and custom triangle-shaped windows, along with related materials, at 30 East 31st Street. ECF No. 125 ("Joint Statement of Facts"), at 2; PX 1 ("Subcontract").[2]

3. This dispute involves the custom windows, which NYR was to install on floors 33 through 40. Tr. 13.

4. On February 7, 2017, Talisman issued to E&T a performance bond of $1,850,000 for NYR's work on the Project, with NYR as the principal and Talisman as the surety. PX 4 ("Bond Agreement").

5. The Bond Agreement provides that Talisman's "obligation under this Bond" arises "[i]f there is no Owner Default." Bond Agreement § 3.

6. The Bond Agreement defines "Owner Default" as "[f]ailure of the Owner . . . to pay the Contractor as required under the

---

[1] Citations to "Tr." refer to the trial transcript.

[2] Citations to "PX" refer to plaintiff's trial exhibits; citations to "DX" refer to defendant's trial exhibits.

Construction Contract or to perform and complete or comply with the other material terms of the Construction Contract." Id. § 14.4.

7. Because the "Bond [was] issued for an agreement between a Contractor and subcontractor, the term Contractor" in the Bond Agreement "shall be deemed to be Subcontractor and the term Owner shall be deemed to be Contractor." Id. § 15; Tr. 211.

8. The subcontract between E&T and NYR included a rider with additional terms and various schedules laying out the scope of work. Subcontract.

9. Although the subcontract initially listed a completion date of January 17, 2018 for NYR's work, it would not have been possible for NYR to complete its work by then because the building's concrete superstructure -- the responsibility of a separate subcontractor with no involvement by NYR -- had not been fully erected. Tr. 175-77.

10. The building's concrete superstructure was not complete until "May or June of 2018." Tr. 177.

11. On March 8, 2019, E&T accepted a revised schedule that NYR proposed. Tr. 208, 368-69; DX 8 ("Revised Schedule").

12. The revised schedule accepted by E&T, which listed June 2, 2019 as the end date for "finalizing the installation" of the custom windows, stated that the schedule was "subject to . . . the Owner providing the upper floors of the site available for installation (free of current debris and protrusions into the window openings)." Revised Schedule at 1.

13. In NYR's letter proposing the revised schedule, "NYR request[ed] that the Owner . . . compel[] its contractors to remove debris from the upper floors and otherwise make installation possible including by removing the protrusions currently in place." Id. at 1-2.

14. E&T understood the letter's reference to "the Owner" to refer to E&T as the Project's general contractor. Tr. 211.

15. On April 16, 2019, Nick Carranza of NYR sent an email to Kevin Tolbert of E&T, and others, stating, "[T]here is no way to install windows even if they were onsite today. There are openings that still need framing which have nothing to do with our windows." DX 9 at 1.

16. In another email sent on the same day, also from Nick Carranza to Kevin Tolbert and others, Carranza described "numerous obstructions throughout floors 33-39 preventing NYR from putting in windows." Id. at 2. "Just to give one example," the email stated, "the outriggers for the scaffolding on [the] 35th floor is [sic] preventing any installation of windows in this location and will continue to do so until the scaffolding is removed." Id.

17. That email attached a "Custom Shape Window Onsite Conditions Report" that Carranza had prepared. Id. at 4. The report states that its purpose is "to illustrate the onsite conditions of floors 33-39 where the custom shape windows are to be installed." Id. The report contained pictures and written descriptions of impediments to

4

installation of those windows on each of floors 33 to 39. Id. at 4-13.

18. According to the report, windows could not be installed on the 39th floor because of "steel beams protruding from the window openings," around which there was "no way to maneuver." Id. at 4.

19. According to the report, windows could not be installed on the 38th floor because of "metal panels piled throughout the floor which need to be removed in order to start work." Id.

20. According to the report, windows could not be installed on the 37th floor because, on the south elevation of the building, "there [was] plywood blocking the openings and the hoist anchor/support [was] coming through the window opening." Id. at 5. On the north elevation of the 37th floor, to which NYR did have access, NYR had "started to waterproof openings" for the windows. Id.

21. According to the report, windows could not be installed on the 36th floor because, on the north elevation, "there [were] piles of drywall and framing on the ground in front of the window openings," and on the south elevation, "there [were] steel beams dispersed on the floor as well as plywood in front of the openings . . . preventing access to these windows." Id.

22. According to the report, windows could not be installed on the 35th floor because of "various suspended scaffolding outriggers protruding from the window openings." Id.

23. According to the report, windows could not be installed on the 34th floor because of "steel beam supports as well as a shanty in front of the window openings." Id. at 5-6.

24. According to the report, windows could not be installed on the south elevation of the 33rd floor because of "piles of metal framing lying on the floor in front of the window openings that need to be moved . . . prior to installation." Id. at 6. NYR had begun waterproofing window openings on those parts of the floor that it could access. Id.

25. The photographs attached to the report corroborated the written descriptions. Id. at 7-13.

26. On May 20, 2019, Mario Lisman, a senior project manager at NYR, sent an email to Kevin Tolbert of E&T, and others, detailing numerous impediments to NYR's ability to install the custom windows. DX 10. Among them, Lisman referred to "countless emails sent to E&T" about "[c]learing each level to access the openings." Id.

27. On May 24, 2019, NYR sent Kevin Tolbert a letter about delays to the revised schedule. DX 11. The letter noted "that there are still many areas that NYR does not have access to install custom shape receptors."[3] Id. at 2. "In fact, on May 23, 2019 [NYR was] directed by E&T to only . . . work on floors 36 and 37 due to other trade materials on the other floors." Id. "In addition," the letter continued, "NYR

---

[3] A receptor is framing for a window around the perimeter of the opening, which provides additional stability and is installed before the window itself. Tr. 44-45.

6

has been unable to install receptors on 38, 35, and 34 due to materials on the floors and/or protrusions in the window openings." Id.

28.  The same letter stated that although "the Project is not yet ready for the install[ation] of the custom shaped windows, the custom shaped windows have been released to the transport company." Id. The letter attached an invoice and transport documents from earlier that month showing that numerous windows were being shipped from Italy to New York, with an ultimate destination of 30 East 31st Street. Id. at 3-6.

29.  On June 10, 2019, E&T sent NYR a Notice of Default and Opportunity to Cure, for, among other things, failing to meet the revised schedule. PX 53; Tr. 56-57.

30.  NYR responded by letter to Kevin Tolbert on June 13, 2019. DX 16. NYR wrote that "there has been no NYR failure, just a failure to provide NYR with sufficient access, properly sized concrete openings, among other continuing Project issues." Id. The letter continued that NYR had provided E&T with "shipping documents and photos of completed windows," had "verbally informed [E&T] of the progress of the custom windows," and had sent NYR "an interim Sea Way Bill." Id. The interim Sea Way Bill included a shipping list and tracking number for the custom windows. Tr. 389.

31.  In late June and early July 2019, Kevin Tolbert followed up with NYR by email about the status of the windows. DX 18. Tolbert had learned that the windows had come into port on June 28, 2019. Id.

7

32. On July 12, 2019, Mario Lisman of NYR responded that "there are many obstructions onsite that will not allow NYR to deliver the windows in an expeditious manner as we plan to do." Id. As a result, rather than deliver the windows to the site, "NYR took the extra measure to receive and store the shipment to prevent the windows from being damaged and took the initiative to incur additional charges to store the material in a controlled environment." Id.

33. Lisman's July 12, 2019 response included a link to photographs Lisman took that same day, showing that "the floors are not free and clear of debris and materials to perform any installation and store materials needed to complete any installation." Id.

34. The same day, which was a Friday, Monique DeLacroix, the president of NYR, sent an email to Kevin Tolbert and others stating that "[o]n Monday," NYR would "arrange to walk the site with [E&T's superintendent] in order to clear the path for us to install the windows directly in the openings." DX 19.

35. On the following Monday, however, July 15, 2019, E&T sent NYR a Final Notice of Default and Opportunity to Cure, again citing NYR's failure to meet the revised schedule and related problems. PX 64.

36. On July 16, 2019, Dan Pirvulescu of NYR sent an email to various people at E&T, including Kevin Tolbert, stating, "It is amazing how every time we have asked to walk[] the building we were denied." DX 21.

37. NYR sent another letter to E&T on July 18, 2019, in response to the Final Notice of Default. DX 22. The letter stated that "all the alleged defaults have already been cured" except for the delayed delivery of the custom windows. Id. at 1. "Just prior to E&T's recent notice," the letter continued, "on July 12, 2019, NYR again communicated to E&T that there were (a) obstructions in the window openings preventing NYR's work to install the windows and (b) materials and other items strewn about on floors 33-39 preventing the delivery of the windows from the hoist and also storage of those windows on the floors." Id. "Moreover, on July 15th, NYR was again on the Project site and documented the material obstructions in the path of the hoist and on the floors preventing delivery, storage and installation of the custom shaped windows." Id. at 2.

38. NYR's July 18, 2019 letter stressed "that NYR has the custom shaped windows in storage and NYR is ready, willing and able to deliver and install the custom windows to the Project." Id. "NYR placed the windows in storage as there is obviously no room for storage on the Project site" and "NYR is currently being prevented from performing by E&T." Id.

39. The July 18, 2019 letter also explained that NYR had been able to, and did, install receptors for 46 of the 82 custom window openings. Id. "On the other hand, there are 36 window openings where NYR is prevented from installing the receptors due to the hoist and/or scaffolding outriggers being located in the openings." Id.

40. The July 18, 2019 letter further explained that "NYR was able to perform the receptor work since the receptors are not bulky/heavy and could be installed by working around the material obstructions still located on those floors." Id. "NYR [was] unable to do the same with the windows since they are in one piece (glass and frame), are very bulky and heavy, and require no less than four men to move each window from the hoist, onto the floor and then to manipulate it in to the opening." Id.

41. On July 19, 2019, E&T responded with a Notice of Termination of NYR's employment on the Project. PX 73. The notice stated that NYR "continue[d] to remain in default of [its] contractual obligations" because NYR "failed to deliver all windows to the project site." Id. Accordingly, NYR and its employees were "no longer permitted on the Project site." Id.

42. When asked at trial about E&T's reason for terminating NYR, Kevin Tolbert responded only about NYR's failure to timely deliver the custom windows. Tr. 154-55.

43. E&T sent a copy of the Notice of Termination to Talisman. PX 73.

44. On July 24, 2019, Talisman sent a "Claim Inquiry Letter" to E&T seeking documentation about the value of the claim and compliance with the terms of the subcontract and the Bond Agreement. PX 75.

45. E&T sent the requested documents to Talisman on August 5, 2019. PX 78. The same day, Kevin Tolbert sent a follow-up email on

10

behalf of E&T to Talisman, demanding that Talisman "perform its obligations under the Bond." PX 77.

46. Talisman suggested that E&T and NYR meet to "work out the differences on the site conditions." ECF No. 126 ("Foster Dep."), at 107.[4] The result, however, "was no discussion" because Kevin Tolbert of E&T "refused to meet." Id. As a result, Talisman came to the "conclusion . . . that [E&T] didn't want the windows." Id. Indeed, based on Talisman's own review of the letters and emails that had been exchanged between E&T and NYR, Talisman believed that numerous of Tolbert's statements "were untrue." Id. at 107-08.

47. On August 21, 2019, Talisman sent a letter to E&T stating that it "has no obligation under [the Bond Agreement] because the Owner is in default under the Construction Contract." PX 83. In particular, Talisman concluded, "[t]he actions of the Owner prevented the Principal from being able [to] perform its work under the Construction Contract." Id. The letter listed numerous aspects of E&T's apparent default, but relevant here is that although NYR "placed [E&T] on notice that it could not deliver materials until there was assurance the materials would not be damaged," "[t]he unclean, inaccessible, unorganized, and dangerous conditions of the worksite subject the windows, if delivered, and workers, to damage and injury." Id. Attached as exhibits to the letter are numerous photos showing

---

[4] The deposition of John Foster, vice president of Talisman, was designated and received in evidence, save for portions to which the Court sustained objections.

11

construction equipment and miscellaneous bulky items strewn across the floor in various parts of the upper floors of the building, obstructing access to the window openings. Id.

48. At trial, the Court heard testimony from numerous witnesses whom the Court found fully credible corroborating the contemporaneous photographs, emails, and letters that showed construction debris, materials, and other items clogging routes of access to, and spaces directly in front of, the openings for the custom windows.

49. For instance, the Court credits the testimony of Nicholas Carranza, who was the controller of NYR with some project management responsibilities from May 2017 to January 2020 but is no longer employed there. Carranza visited the Project site consistently from February to July 2019. Tr. 489-90.

50. Carranza described that in February 2019, the floors on which the custom windows were to be installed -- the "upper floors" of the building -- contained "stacks of panels all over," "metal studs and framing for the . . . carpenter," and "miscellaneous materials, whether it's plywood, they had gypsum board, the green gypsum board installation . . . stored on the upper floors." Tr. 491.

51. According to Carranza, in March 2019 "[n]othing really changed" and the upper floors of the building were marked by "[v]ery similar conditions." Tr. 491.

52. According to Carranza, in April 2019, the upper floors again had "[v]ery similar conditions," in addition to "rigging materials

12

that were basically all over the floors holding the scaffolding in place." Tr. 491-92.

53. According to Carranza, May 2019 was more of the "[s]ame conditions" on the upper floors. Tr. 492.

54. According to Carranza, his observations in June 2019 showed the "[s]ame thing" on the upper floors -- "still the piles of the metal framing, the panels for the exterior work was still up there." Id. "The scaffolding [was] still up there." Id. "There was also steel tubing being stored on the roof on those floors as well." Id.

55. Finally, according to Carranza, he saw "[s]till very similar conditions" in July 2019. Id. "The panels, the framing, the scaffolding was still up, everything was basically the same." Id. at 492-93.

56. Dan Pirvulescu, NYR's technical director who appeared under subpoena and had been at the Project site daily in spring 2019, testified similarly and credibly. Pirvulescu explained that the custom windows were up to 10 feet in height and the majority of those windows had a base of 5 feet or more. Tr. 333-34. Indeed, Kevin Tolbert of E&T corroborated that "[a]ll the windows were floor to floor height," stretching "from slab to ceiling," which "was 10 feet." Tr. 323-24. The custom windows weighed hundreds of pounds each. Tr. 367.

57. In the late spring of 2019, E&T specifically instructed NYR not to work on certain floors between 33 and 39 "because of materials stored in such areas." Tr. 388.

58. Pirvulescu testified that, within a few days of the custom windows' arrival to port in June 2019, NYR photographed the Project

13

site and "asked Mr. Tolbert to walk with us to give us space where to store his windows." Tr. 360. Pirvulescu then walked the site with E&T staff, observing at the time that "[t]here was a lot of debris." Tr. 361. "There was a lot of other materials in the way." Id. "There was barely room for a person to walk." Id.

59. Although Pirvulescu told E&T staff during that walkthrough that the obstructions prevented installation of the windows, E&T staff responded that "[t]here was nothing they could do" because "[t]here was no space." Tr. 362.

60. Pirvulescu was at the Project site on July 18, 2019, the day before E&T sent NYR its Notice of Termination. Pirvulescu once again observed that obstructions prevented NYR from even delivering the custom windows to the site. Tr. 393-94.

61. Pirvulescu testified that he spoke with E&T's site safety manager "[o]n a daily basis . . . about site conditions that need to be addressed." Tr. 395. The site safety manager merely told Pirvulescu to raise the issue with Tolbert. Id.

62. The testimony of one of E&T's own witnesses, Oran Revivo, a third-party architect hired by E&T to perform an inspection and prepare a report of the Project, supported NYR's account. Tr. 263-64. Revivo's report from a June 19, 2019 visit to the Project site stated that "floors 34, 35, 37, 38, and 39 all have construction materials in place . . . at the north side of the building that prevented Mr. Revivo from properly inspecting certain openings and openings that were not completed on the south side." Tr. 277-79. Revivo formally recommended

14

in the report that "all obstructing equipment and/or construction materials should be moved prior to inspection." Tr. 279.

63. Although Kevin Tolbert testified that debris and obstructions did not impede NYR's ability to install the custom windows, the Court finds Tolbert's assertion not to be credible in light of the contemporaneous photographic and documentary evidence and the credible testimony of other witnesses to the contrary.

64. Indeed, the Court does not believe that NYR would have had an incentive to pay for storage of the windows, as it did on its own dime, rather than deliver the windows to the Project site, if such delivery were feasible. The Court credits the testimony of Nicholas Carranza and Dan Pirvulescu that NYR only did so because the Project site could not accommodate the windows. As Pirvulescu explained, at the time NYR was terminated, "it was absolutely impossible to deliver any windows to that project site due to other materials and other debris and other things that were all over the floors, in the hallways, in front of window openings." Tr. 474. "The material would have got damaged." Id.

65. Nor did NYR have an incentive to keep the windows for other use or resale, because the windows' design, shape, and size were custom for the Project. Tr. 474-75, 480-82.

## II. Conclusions of Law

The governing law is rather straightforward and is not in dispute. "As courts have done for over a century," the Court "look[s] to standard principles of contract interpretation to determine the rights

15

and obligations of a surety under a bond." U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co., 369 F.3d 34, 51 (2d Cir. 2004). "One of those principles is that, before a surety's obligations under a bond can mature, the obligee must comply with any conditions precedent." Id. "A condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." Id.

Under the plain terms of the Bond Agreement, Talisman's obligations as surety "shall arise" only "[i]f there is no Owner Default under the Construction Contract." Bond Agreement § 3. Because Talisman's bond was "issued for an agreement between a Contractor and subcontractor, the term Contractor shall be deemed to be Subcontractor and the term Owner shall be deemed to be Contractor." Id. § 15. In other words, the Bond Agreement specifically provided that Talisman had no bond obligations to E&T if E&T itself defaulted under its subcontract with NYR. And the Bond Agreement defined such a default to include a failure "to perform and complete or comply with the other material terms of the" subcontract. Id. § 14.4. Indeed, E&T agrees in its proposed conclusions of law that "Section 3 of the Performance Bond issued by Defendant, as surety, and NYR, as principal pursuant to the Subcontract expressly provides that Defendant's obligations under the Performance Bond arise upon the following: (1) there is no default by Plaintiff." ECF No. 136, at 29-30.

There is also no dispute that the terms of the March 8, 2019 revised schedule form part of the subcontract. The revised schedule

16

states in no uncertain terms that it is "subject to . . . the Owner providing the upper floors of the site available for installation (free of current debris and protrusions into the window openings)." Revised Schedule at 1. Rather than argue that any failure to comply with that condition would not be an "Owner Default" under the Bond Agreement or that the condition was not a material term of the subcontract, E&T instead contends, as a factual matter, that it "indeed provided suitable areas at the Project site to store NYR's materials and equipment and did not hinder or obstruct NYR's ability to deliver the custom windows to the Project." ECF No. 136, at 31.

As the above findings of fact make clear, however, the Court rejects E&T's factual assertion. The Court concludes that because E&T failed to make the upper floors of the Project site -- floors 33 to 40, where the custom windows were to be installed -- available for installation by clearing those floors of debris and obstructions, E&T was in default of its obligations under the subcontract. And because the lack of any default by E&T was a condition precedent to Talisman's obligations under the Bond Agreement, Talisman held no such obligations and is not liable.

E&T's only counterargument that is legal, not factual, is that Talisman did not sufficiently prove the defense of impossibility. E&T argues that even if some construction debris or obstructing items made it more difficult for NYR to install the windows, Talisman has not shown that the installation was objectively impossible or that the impediments to installation were unforeseeable. But E&T's invocation

17

of the affirmative defense of impossibility is inapposite. The Court's conclusion of law is not that any affirmative defense bars liability, but that the elements of E&T's cause of action are not satisfied because Talisman's obligations under the Bond Agreement were not triggered.

The terms of the revised schedule -- which, again, both parties agree is incorporated into the subcontract -- required E&T to provide "the upper floors of the site available for installation." Revised Schedule at 1. Lest there be any ambiguity, the agreement further specified what that meant: E&T was required to make those floors "free of current debris and protrusions into the window openings." Id. The Court has found that E&T did not do so.

Because the Court concludes that Talisman is not liable, the Court does not address E&T's arguments about damages. The Clerk is respectfully directed to enter final judgment for defendant Talisman and to close this case.

SO ORDERED.

New York, NY
November 6, 2023

JED S. RAKOFF, U.S.D.J.

18